IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 3, 2021

**IN RE ELIJAH R.**

**Appeal from the Chancery Court for Washington County**
**No. 19-AD-0412     John C. Rambo, Chancellor**

_____

**No. E2020-01520-COA-R3-PT**
_____

This appeal involves the termination of a father's parental rights to his son. The trial court found grounds for termination based on persistent conditions and failure to manifest a willingness and ability to assume custody or financial responsibility. It also found by clear and convincing evidence that termination was in the best interest of the child. We reverse the trial court's finding of persistent conditions but otherwise affirm the termination of parental rights and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed in Part; Affirmed in Part; and Remanded.**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and FRANK G. CLEMENT, JR., P.J., M.S., joined.

Dustin D. Jones, Johnson City, Tennessee, for the appellant, Brian R.

Jerry J. Fabus, Jr., Johnson City, Tennessee, for the appellees, Andrew W. and Amanda W.

**OPINION**

## I. FACTS & PROCEDURAL HISTORY

The child at issue in this proceeding, Elijah, was born in August 2016 to unmarried parents, Brian ("Father") and Kacei ("Mother").[1] Father's name was placed on the child's birth certificate. Elijah lived in a home with both parents for the first year of his life. However, in February 2018, when Elijah was around 18 months old, Mother and Father had a series of disputes that led to their separation. Father admits that he and Mother regularly used Subutex, and he also smoked marijuana.[2] According to Father, Mother's

---

[1] We refer to the parties in this manner to protect the privacy of the child.
[2] Buprenorphine (Suboxone/Subutex) "is prescribed 'to help people reduce or quit their use of heroin or

drug use had worsened and "there was more involved than . . . our normal," so he was attempting to "separate [him]self" from the situation. Father called the police twice within a matter of days. The first time, he and Elijah were staying the night at his parents' house while Mother was working, and she came to the home furious around 2 a.m. wanting to retrieve the child. After the police arrived, she agreed to let the child stay. However, after Father returned home the next day, Mother began hitting him and choking him in front of Elijah, which led him to call law enforcement again. The police informed Father that he had no legal right to keep Elijah in his custody because he and Mother were not married.[3] Mother's sister ("Aunt") was a law enforcement officer herself, and she physically removed Mother and Elijah from the home. Aunt advised Mother about how to obtain an order of protection and insisted on taking Mother to obtain one against Father. Father removed his belongings from the residence he and Mother had been renting and moved in with his parents.

On February 12, 2018, both Mother and Father sought relief in the court system. Father filed a petition to establish parentage in juvenile court, seeking a declaration that he was the legal father of Elijah in addition to custody and/or visitation rights. Mother filed a petition for an order of protection in general sessions court. In her petition, Mother asserted that she and Elijah were both in need of protection because Father had "tried to run off" with Elijah and she and Father were "physically fighting" until police arrived, which left bruises on her. She also alleged that Father had broken her phone and the windows of their home and van and was believed to be using methamphetamine and marijuana. That same day, the general sessions court issued an ex parte temporary order of protection prohibiting Father from coming about Mother or Elijah.

Around this time, the Tennessee Department of Children's Services received a referral regarding Elijah for drug exposure and psychological harm. DCS drug screened Mother on the same day she filed the petition for an order of protection, and she tested positive for methamphetamine, amphetamine, and buprenorphine. She produced a valid prescription for buprenorphine. Two days later, on February 14, DCS held a meeting regarding Elijah. An "Immediate Protection Agreement" was prepared by DCS, noting Mother's failed drug screen and the order of protection providing for no contact between

---

other opiates, such as pain relievers like morphine.'" *In re Colton B.*, No. M2018-01053-COA-R3-PT, 2018 WL 5415921, at *3 n.4 (Tenn. Ct. App. Oct. 29, 2018) (quoting *Buprenorphine*, Substance Abuse and Mental Health Services Administration, *available at* https://www.samhsa.gov/medication-assisted-treatment/treatment/buprenorphine). Buprenorphine is a Schedule III controlled substance. *State v. Boykin*, No. E2019-02070-CCA-R3-CD, 2021 WL 796838, at *1 (Tenn. Crim. App. Mar. 2, 2021); *State v. Milligan*, No. W2019-00377-CCA-R3-CD, 2019 WL 6139569, at *1 n.2 (Tenn. Crim. App. Nov. 19, 2019) *perm. app. denied* (Tenn. Apr. 1, 2020). Throughout the transcript of testimony in this case, the parties refer to Suboxone and Subutex interchangeably.

[3] "Absent an order of custody to the contrary, custody of a child born out of wedlock is with the mother." Tenn. Code Ann. § 36-2-303. This statute provides "the default rules for child custody involving unwed parents." *Baxter v. Rowan*, 620 S.W.3d 889, 894 n.8 (Tenn. Ct. App. 2020).

Father and Elijah. DCS drug screened Father, and he tested negative for all substances. Mother and Father agreed for Elijah to be placed with Aunt and her husband ("Uncle"). DCS requested that both parents participate in family violence intervention services.

A hearing on the petition for an order of protection was held in general sessions court on March 2, but Mother requested a continuance. The matter was reset for April. The general sessions court entered an order providing that the ex parte order of protection would remain in effect and that Mother would have temporary custody of Elijah until the matter was heard. Father was drug screened for a second time on March 2, and this time he tested positive for amphetamines but stated that he was taking diet pills.

On March 5, 2018, DCS filed a petition for dependency and neglect and to transfer temporary legal custody to Aunt and Uncle. The petition described Mother's recent positive drug screens and the order of protection prohibiting contact between Father and Elijah. The petition also stated that Father had taken a job out of town that further prevented him from providing daily care for the child. It stated that Father had agreed to submit to a hair follicle drug screen. According to the petition, Mother was residing with her mother. The petition stated that Elijah was already in the care of Aunt and Uncle pursuant to an agreement with the parents. On March 8, the juvenile court entered a protective custody order awarding temporary legal custody of Elijah to Aunt and Uncle. After a preliminary hearing was waived, the juvenile court appointed counsel for Father and scheduled an adjudicatory hearing for May 2018.

At the scheduled adjudicatory hearing on May 16, DCS requested a continuance. The juvenile court's order states that Father had agreed to pay for a DNA test and would be allowed to have supervised visits with Elijah once a week once he passed a drug test. Mother and Father announced that they had agreed to dismissal of the order of protection if the court entered a mutual restraining order allowing them to have limited nonviolent contact as to the child. Elijah was to remain in the custody of Aunt and Uncle pending the adjudicatory hearing. Mother's petition for an order of protection was dismissed by the general sessions court when she failed to appear for the next hearing.

After a few months had passed with no visits, Father was allowed to have a couple of supervised visits with Elijah around June. At a scheduled adjudicatory hearing on July 26, 2018, Father reported that he had completed domestic violence counseling, and he again agreed to take a hair follicle drug test. He was also directed to complete the DNA test. Mother was "allegedly" in a rehabilitation facility, and the matter was continued. Father was to have supervised visitation through DCS.

Elijah turned two in August. After an adjudicatory hearing on September 24, 2018, the juvenile court entered an adjudicatory order declaring Elijah dependent and neglected. The order states that both parents had agreed to take hair follicle drug screens offered by DCS and failed to do so, and the court considered their failures as equivalent to positive

- 3 -

screens. The order states that Father displayed "an attitude that he seems to know better than the professionals." The order states that both parents had "a lot of work to do" but that there was "still hope that they can regain custody if they apply themselves to this process." The court ordered both parents to complete parenting classes, complete hair follicle drug screens, and pay child support. DCS was directed to assess the home of Father's parents, where he lived, to determine if they would be suitable to supervise visits between Father and Elijah. If so, Father was to have supervised visits with Elijah every Sunday from 11 a.m. to 5 p.m. at the home of his parents. Father's parents were to remain in sight of Father and Elijah at all times. The court scheduled a review hearing for two months later.

At the review hearing on November 26, 2018, DCS moved to close its case. Counsel for the parents agreed that DCS could close its case but asked the court to continue the matter to determine if the parents were making progress. The order states that it was contrary to the best interest of Elijah to return to the care of his parents at that time, and the court set another review hearing for two months later.

After a child support hearing in January 2019, Father's child support obligation was set at $793 per month. An order of parentage was finally entered on February 21, 2019, declaring Father to be the biological and legal father of Elijah. On the same day, the juvenile court held the post-dispositional review hearing in the dependency and neglect case. The order states that Father's mother had filed an intervening petition for custody of Elijah. Due to Father's recent diagnosis with a contagious disease, the parties agreed to continue the matter. However, the juvenile court approved a request for Father's mother to supervise visits between Mother and Elijah for six hours per week in addition to the visits they were already supervising between Father and Elijah. The court continued the hearing on the grandmother's petition for custody and the post-dispositional review and ruled that it was in the best interest of Elijah to remain in the temporary custody of Aunt and Uncle. The juvenile court's order to that effect was entered on April 25, 2019.

Before those matters were heard, on June 4, 2019, Aunt and Uncle filed a petition in chancery court seeking to terminate the parental rights of Mother and Father and to adopt Elijah. By that time, Elijah had been in their home for approximately fifteen months. The guardian ad litem from the juvenile court proceeding joined in the petition. The petition alleged two grounds for termination: persistent conditions and failure to manifest a willingness and ability to assume custody or financial responsibility. Counsel was appointed for Father and Mother.

Elijah turned three in August. In October, the guardian ad litem filed a motion to suspend the parents' visitation and order drug screens, alleging that neither parent had been compliant with drug screen requests in the past year or completed a hair follicle screen as required by the juvenile court's adjudicatory order from the previous October. After a hearing on October 21, 2019, the chancery court entered an order declining to suspend

visitation but granting the motion to have the parents drug tested. According to the order, "Father testified under oath that only marijuana would be present in his system." Both were ordered to take a nail bed drug screen within 48 hours of notice that Aunt and Uncle had arranged payment for the screen. The order stated that failure to submit to the drug screen would result in an adverse finding against that parent. Again, however, Father failed to complete the drug screen.

While the case was pending, Mother was arrested and charged with manufacturing methamphetamine. Prior to trial, Mother surrendered her parental rights and joined in the petition filed by Aunt and Uncle. The termination trial was ultimately held on June 10, 2020.[4] The trial court heard testimony from Aunt, Uncle, Father, Father's mother, and Father's father. Mother did not testify.

Aunt and Uncle had two children who had already reached the age of majority. Aunt described taking Elijah into her home in February 2018 after the police were called due to arguments between Mother and Father. Aunt said she insisted on taking her sister to get an order of protection against Father and drove her to the location where she could do so. She said that DCS showed up while they were there, but Aunt was unaware of who made the referral to DCS. Aunt testified that Mother had described domestic violence in the home and told her in the past that she and Father were using drugs. Aunt conceded that her sister had "been known to lie." However, she testified that when DCS got involved, Father also called her stating that they needed help and that they were on drugs. When she asked what kind, he said "the kind that would have our children taken away."[5] Aunt recalled that Mother tested positive for methamphetamine when she was initially tested by DCS.

Aunt said that Elijah was in her home for "about a month" pursuant to the immediate protection agreement with DCS before the dependency and neglect petition was filed and the protective custody order was entered actually giving them legal custody. Mother stayed overnight on occasion during supervised visits. Mother was ultimately banned from the home after Aunt discovered drugs in her possession on two occasions.

Aunt testified that Elijah was "struggling" developmentally when he came to their home and "wasn't talking very well." She said DCS sent people to their home to test him. She explained that at eighteen months, he "wasn't speaking at all" but "was grunting and that was about it."

Aunt testified that she had initially hoped that both parents would get the assistance

[4] We note that the two volumes of transcript in the appellate record state that the proceedings were held on October 27, 2020. However, the trial court's final order states that the case was tried on June 10, 2020, and it is stamped October 12, 2020, so we presume that the dates listed on the transcripts are incorrect.
[5] Mother had an older child, Elijah's half-brother, who was living with them at the time.

they needed and care for Elijah. In the beginning, she and her husband had supervised some visits for both parents, but there were times that neither parent showed up. Eventually, Father's parents were approved to supervise his visits. She said "they didn't have a working vehicle so we took the child to them every week at their home and would pick him up." Aunt said that she and her husband received "a few belligerent phone calls" from Father and text messages with cursing and complaining, so they decided they were not comfortable going to the home anymore. They began meeting to exchange the child, with Father's mother driving him to exchanges or coming alone.

Aunt was not aware of what services, if any, DCS provided for Father. She recalled that he was required to complete domestic violence class, parenting class, and drug screens. In her opinion, neither parent made efforts to remedy their situation to allow Elijah to be returned to them. Aunt had concerns about returning Elijah to Father in light of his history of drug use and refusal to take drug screens. Aunt described the hearing the previous October when the chancellor had ordered Father to take a nail bed drug screen at her expense. She recalled Father's testimony that he would test positive for "just marijuana." Aunt said that Father did show up to take the nail bed drug screen, but his nails were so short that the test could not be completed. She said the deadline was extended for a couple of weeks but that Father never returned to complete the test.

Regarding child support, Aunt testified that Father had never directly paid support for Elijah during the 28-month period that Elijah had been in her home. She had received funds on three occasions from tax refund and stimulus payment intercepts, but never anything directly from Father. She said Father had mentioned working a few times during that period and that he was sometimes out of town working for periods of four to six weeks. Aunt explained that Father's child support obligation of $793 per month was based on imputed minimum wage but adjusted due to her daycare expense.

Aunt had observed a difference in Elijah's behavior when he was visiting Father or not visiting Father. She said that in recent months, Father's visits did not occur "for a couple of weeks or a month" due to Covid-19. She said that Elijah was great and that he had no issues during that time. Since Father's visits had resumed, Elijah had become very attached to her and her husband and did not want them out of his sight. He had not been sleeping well and had decided he did not like school.

Uncle testified as well. He acknowledged that his children were grown and that he initially had no intention of starting over raising children. However, he and Aunt had agreed to the initial placement with the hope that both Mother and Father could get the help they needed and be reunited with Elijah. After time passed with what they perceived to be "no progress," they came to believe "this would go on indefinitely." Uncle believed that it was in the best interest of Elijah to remain in their home. He testified that Elijah had made great progress in their care. Uncle testified that Elijah was very integrated in the family and that a change in caregivers would absolutely be detrimental to him. He said

that Elijah had very strong relationships with his two adult children. In addition, he and his wife maintained contact with the half-brother of Elijah who was in the care of his biological father.

Uncle also described the changes in Elijah's behavior in relation to his visits with Father. According to Uncle, Elijah is generally well behaved, but for a day or two after visits with Father, he exhibits aggressive, hostile, adversarial, and very defiant behavior and "even has come back cursing." Uncle said he and Aunt agreed that Elijah's attitude improved tremendously when visits were cancelled due to Covid-19, and since visits had resumed, his behavior had worsened. In short, Uncle did not think that Father's visits had a positive impact on Elijah. He said that Elijah had thrown a tantrum when leaving visits with Father "a couple of times" but that 90 percent of the time he comes to him and his wife without issue. Uncle also testified that after a visit in March 2020, Elijah said he had seen Father hit Mother. Uncle said he saw Mother about seven days later, and she had a black eye.

Father also testified. He described Mother taking Elijah from their home after their physical altercations and encounters with the police. However, he insisted that it was Mother who was physically assaulting him. He said the police would not allow him to keep Elijah in his custody because he and Mother were not married. Father said he went to file a petition to establish parentage either the same or the following day. Due to the order of protection, he was not allowed to visit with Elijah for several months, but he said Elijah remembered him when their visits started. Father suggested that it took him several months to get the DNA test completed due to financial issues. He said he completed the domestic violence counseling because it was recommended, but he denied that he was abusive to Mother. Father said he had attempted to start parenting classes as well, but when he went to the place that was recommended, he was told that parenting classes were not offered there. He said he told a caseworker from DCS about this and she was supposed to follow up with him, but she never did. Father said he had intended to keep making progress through the juvenile court proceeding, but DCS closed its case, the post-dispositional hearing was continued due to his illness, and the termination petition was filed shortly thereafter.

At the time of the termination trial, Father was 28 years old and still residing at the home of his parents. He testified that he was "laid off right now" but employed as a millwright doing maintenance and fabrication work. He said his pay depended on the job but ranged from $10 to $25 per hour. As of trial in June 2020, Father testified that Covid-19 had shut down his employment. He explained that prior to the pandemic, he would travel for work in a seasonal manner, sometimes working for a month or two and then being off for a month or two. When asked why he had not paid any child support, Father responded, "I haven't worked a lot." He said he paid rent to his parents and "[had] to live too." He said, "I guess I could pay if they'll take partial payments or something. I don't know how that works. I, I've failed to check into that." When asked about providing

necessities like food for Elijah, Father said, "I could feed him," but immediately added, "I'm sure [Aunt and Uncle] do a good job." Father testified that he smoked cigarettes and had "cut down" to a pack every two days. He was asked if he spent more money on cigarettes than supporting his child and said, "If that's the way you presume it. That's not the way I, I would declare it but." He was asked how much money he had and simply said, "enough." However, he later admitted that he had no bank account or savings. Father had no vehicle and no driver's license. Father admitted that if not for his parents, he would essentially be homeless.

Father was still having weekly visits with Elijah for several hours on Sundays at the home where he resided with his parents. However, the visits were supervised by his parents. Father described having fun with Elijah during their visits every weekend. He said they celebrated Christmas and Elijah's birthday with Elijah during their weekly visits around those occasions. Father said he gave Elijah gifts such as clothes, shoes, and a bicycle, but that these things were kept at his parents' house. Father said that Elijah still calls him "Daddy" and loves him. He also said Elijah enjoys playing with cousins and is very attached to Father's parents. Elijah had his own bedroom at the paternal grandparents' home, along with toys and clothing. Father said that Elijah cries when he has to leave, and sometimes Father has to chase him down to put him in the car. He explained that it was not that Elijah did not want to go with Aunt and Uncle, but that he simply did not want to leave "his other family." Father denied that he encouraged Elijah to act defiantly or curse. He suggested that if Elijah "acts up" after visits, it could be because it was hurting him not to be with his father. He also suggested that Elijah was probably confused having to go back and forth, as a three-year-old. Father said Elijah acted defiantly with him also, saying things like "I don't have to listen to you." Thus, he admitted that the current situation was not something that would be in the best interest of Elijah for the long term. He agreed that the current situation was not working out in a way that was best for Elijah emotionally. At the same time, however, Father believed that it would be detrimental to Elijah to terminate his parental rights.

Father denied hitting Mother on the date when Elijah made the comment and said that if Mother had a black eye around that time, it was not because of him. When Father was asked if Mother had been present for visits at his parents' home, Father said, "Once or twice but not since that[,] since the trouble began[,] since, since she got in trouble, I guess." When asked later to confirm whether Mother had been around Elijah in the past couple of weeks, Father denied it, stating, "not in the last couple months not since she's got charged with manufacturing or whatever she got charged with." He added, "she's not been to my house since."

Father admitted that he had also "got in a little, little bit of trouble" during the termination proceeding. In September 2019, three months after the petition was filed, Father was arrested and charged with disorderly conduct, public intoxication, resisting arrest, simple assault on an officer, and felony vandalism. According to the affidavit of

- 8 -

complaint completed by the arresting officer, on September 13 at 4:27 p.m., officers were dispatched in response to a 911 call stating that a man was "walking in the street and trying to get into vehicles." Upon arrival at the scene, Father was observed sitting in a vehicle, but he immediately got out of the vehicle and approached the officer. Father kept putting his hands in his pockets despite directions not to do so and was "throwing his belongings on the pavement." He became aggressive toward two officers and told them to take him to jail because he was "too drunk." He smelled of alcohol and was slurring his words. A friend of his advised that he had been drinking "a lot." According to the affidavit, Father was yelling obscenities at his friend and also at his parents, who had also arrived on the scene. When officers attempted to handcuff Father, he started to resist by pulling away. He then kicked an officer in the leg while he was being placed in the police cruiser. Father reportedly tensed his body and refused to sit down, then threw himself backwards onto the ground. After five minutes of resistance, officers were finally able to get Father in the car. At that point, Father "bit the rear camera wires causing the video display to be inoperable." Father "was hobbled and a spit mask was placed on his face to keep him from spitting at officers." He was then transported to jail. When Father was asked at the termination trial if he chewed through the camera cord of a police cruiser, he responded, "That's what they said. I, I was intoxicated." Father could not remember and said he did not remember "much of that day." Father claimed that he did not drink often. After the incident, he pled guilty to simple assault on an officer, vandalism, and public intoxication. Father spent ten days in jail and was placed on probation and fined. However, Father noted that he had no other criminal convictions.

Father acknowledged that he had refused every drug screen that was not a urine screen. He admitted he had stood in court and told judges "a couple" times that he would take a hair follicle or nail bed drug screen but never completed the tests. Father was asked why he never took the nail bed drug screen that the chancery court had ordered him to take in October 2019, four months after the termination petition was filed. He replied, "Because that goes back a long ways, . . . and I was sure to have failed it." Father said he "was afraid . . . it would cause me to lose my son forever." Although Father had stated under oath at the time that he would only test positive for marijuana, he admitted at trial that this statement had been a lie. He continued to insist that he had never used meth, but he conceded that the test probably would have been positive for Suboxone and maybe Xanax. Father believed that taking the test would do him more harm than good so he "chose not to take it at that time." He admitted that he was buying Suboxone and Xanax illegally from an individual in another town, using the money he earned from mowing lawns. When asked how many different times he bought drugs from the man, Father said, "Once or twice. Enough where I didn't want to take that drug test." When asked why he did not just tell the judge that he would also test positive for those substances, Father responded, "Well, because I'm, I'm scared that they'll take my son from me forever. That's why I lied. Yeah. Wouldn't you?"

At trial, Father insisted that he had been "clean" from marijuana and Subutex for

about two months. Thus, he admitted that he had continued to use drugs even after the termination case was filed, up until the final two months. Father claimed that he was not "all the time every day just laid up high," but admittedly, he had "slipped up a couple of times and, and eat a Xanax or done a little bit of a Subutex or smoked a joint." He denied doing this on Sundays when he had visits with Elijah.

Despite these issues, Father insisted that Elijah would be better off in his custody than that of Aunt and Uncle. He claimed that he was both willing and able to assume custody, and he did not believe that Elijah would be at risk of harm in his care. Father was asked if he would be able to care for Elijah on his own, and he said, "Maybe not alone but I have help." When asked if any of his circumstances had improved in the past year, Father said, "I can't blame nobody but myself for my situation." He admitted that he could not reconcile the fact that he had continued to use drugs with his statements about wanting what was best for his son.

Father's parents testified as well. His mother ("Grandmother") testified about Father living with her and how he consistently exercises his weekly visits with Elijah under her supervision. She described how Father and Elijah play and show affection, and she said that Elijah usually does not want to leave after visits. Grandmother testified about filing the petition for custody in juvenile court and the fact that it was never heard due to the filing of the termination petition. She believed that if Father's rights were terminated and Elijah never saw his father or her again, "It would tear [Elijah] up."

Regarding Father's employment status, Grandmother said that "he's been mowing yards." She said that when he works, he pays rent to her. She denied giving Father any money but did say that she bought his cigarettes. She also drove him places and said he had never had a driver's license. Grandmother said that the incident leading to Father's arrest occurred when he was with a girlfriend and they got in an argument, and she called Grandmother to come pick him up. Grandmother said the police arrived at the scene before she did. She also said that Father does not drink often. Grandmother said that he probably gets the money for alcohol from mowing yards.

Grandmother testified that she last saw Mother two or three weeks before trial when she came to visit Elijah at her house. She admitted that she had been aware of the fact that Mother had pending criminal charges due to the fact she was caught with 74 grams of meth. When Grandmother was asked what kind of drugs Father uses, she replied, "None that I know of." When asked about Father's testimony that he had used marijuana, Suboxone, and Xanax for 26 of the last 28 months, Grandmother said she was not aware of that and that she had never seen Father do drugs. Grandmother claimed that she did not let that type of thing go on inside her house. She said she had asked Father about drug use but acknowledged that he may have lied to her.

Father's father ("Grandfather") testified that he had never seen Father using

- 10 -

marijuana or any other drug at his house or suspected him of being under the influence during visits with Elijah. He also claimed that he was unaware that Father used drugs. When asked if he would allow such activity in his house, Grandfather said he "smoke[s] a little marijuana" himself but that he did not allow any other drugs. He confirmed that Mother was in the home for a visit recently and that it was after she had pending criminal charges related to meth. Grandfather believed that it would "interrupt" Elijah's life if he was never allowed to see Father or his paternal grandparents again.

After the testimony from Father's parents, Father was recalled to the stand. He then admitted that Mother had visited with Elijah at his parents' home after she was charged with manufacturing and distributing meth. Father said he and Grandmother had discussed the situation and whether they could prevent her from seeing Elijah when the court had approved of her supervising Mother's visits. Father admitted that his previous testimony about Mother not being at the home since being charged was untruthful, but, he said he "didn't do it on purpose."

At the conclusion of the testimony, the trial court took the matter under advisement. On October 12, 2020, the trial court entered an order terminating Father's parental rights. For reasons that will be discussed in greater detail below, the trial court concluded that Aunt and Uncle had sufficiently proven both grounds for termination – persistent conditions and failure to manifest a willingness and ability to assume custody or financial responsibility. It also concluded by clear and convincing evidence that termination of Father's parental rights was in the best interest of Elijah. Father timely filed a notice of appeal.

## II. ISSUES PRESENTED

Father presents the following issues, which we have slightly restated, for review on appeal:

1. Whether the statutory ground of persistent conditions was sufficiently proven;
2. Whether clear and convincing evidence exists regarding the ground of failure to manifest a willingness and ability to assume custody or financial responsibility; and
3. Whether the trial court erred in finding clear and convincing evidence that it was in the best interest of Elijah to terminate Father's parental rights.

For the following reasons, we reverse the trial court's finding as to one ground for termination but otherwise affirm the termination of Father's parental rights and remand.

## III. STANDARDS APPLICABLE TO TERMINATION PROCEEDINGS

Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *In re Kaliyah S.*, 455 S.W.3d

533, 546 (Tenn. 2015). Pursuant to the statute, the petitioner seeking termination of parental rights must prove two elements. *Id.* at 552. First, that party must prove the existence of at least one of the statutory grounds for termination set forth in Tennessee Code Annotated section 36-1-113(g). *Id.* The grounds are "cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground." Tenn. Code Ann. § 36-1-113(g). Second, the petitioner must prove that termination of parental rights is in the best interest of the child, considering the best interest factors listed in Tennessee Code Annotated section 36-1-113(i). *In re Kaliyah S.*, 455 S.W.3d at 552.

Because of the constitutional dimension of the parent's rights at stake, the party seeking termination "must prove all the elements of their case by clear and convincing evidence." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). To be clear and convincing, the evidence must enable the finder of fact "to form a firm belief or conviction regarding the truth of the facts" sought to be established and eliminate "any serious or substantial doubt about the correctness" of the findings. *Id.*

Due to this heightened burden of proof applicable in parental termination cases, we adapt our customary standard of review on appeal. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). Appellate courts review the trial court's factual findings de novo in accordance with Tennessee Rule of Appellate Procedure 13(d), presuming each factual finding to be correct unless the evidence preponderates otherwise. *In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016). Then, we make our own determination regarding "whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *Id.* (citing *In re Bernard T.*, 319 S.W.3d at 596-97). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## IV. DISCUSSION

### A. Grounds for Termination

#### 1. Persistent Conditions

The first ground for termination at issue on appeal is commonly known as "persistent conditions." This ground for termination applies when:

(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

- 12 -

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

Tenn. Code Ann. § 36-1-113(g)(3). Each element must be proven by clear and convincing evidence. *In re Valentine*, 79 S.W.3d 539, 550 (Tenn. 2002).

The Legislature made "significant changes" to this ground for termination by amendment in 2018. *See In re Emma S.*, No. E2019-00718-COA-R3-PT, 2020 WL 114134, at *6 n.4 (Tenn. Ct. App. Jan. 9, 2020) (citing 2018 Tenn. Pub. Acts 1088, 1089 (ch. 875 § 10)); *In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *7 n.7 (Tenn. Ct. App. Mar. 22, 2019). The prior version of the statute expressly provided that this ground only applied when "[t]he child has been removed *from the home* of the parent or guardian *by order of a court* for a period of six (6) months[.]" Tenn. Code Ann. § 36-1-113(g)(3) (2017) (emphasis added). Although it was not clearly stated in the statutory text, it had been interpreted for years as applying "only where the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse." *In re Audrey S.*, 182 S.W.3d at 874. Thus, courts had consistently recognized that "[a]s a threshold requirement for the applicability" of this ground, "the child must not only have been adjudicated dependent and neglected, but he or she must also have been removed from the defendant parent's home." *In re Kandace D.*, No. E2017-00830-COA-R3-PT, 2018 WL 324452, at *6 (Tenn. Ct. App. Jan. 8, 2018) (quoting *In re Damien G.M.*, No. E2016-02063-COA-R3-PT, 2017 WL 1733867, at *3 (Tenn. Ct. App. May 3, 2017)).

In analyzing this ground, the necessary order of removal has been "'the threshold consideration.'" *In re Lucas S.*, No. M2019-01969-COA-R3-PT, 2021 WL 710841, at *4 (Tenn. Ct. App. Feb. 24, 2021) (quoting *In re Alleyanna C.*, No. E2014-02343-COA-R3-PT, 2015 WL 4773313, at *14 (Tenn. Ct. App. Aug. 10, 2015)). "[W]e begin by examining the order or orders that removed [the child] from [the parent]." *In re Ryder R.*, No. M2015-02461-COA-R3-PT, 2016 WL 4199567, at *6 (Tenn. Ct. App. Aug. 5, 2016); *see In re Makenzie L.*, No. M2014-01081-COA-R3-PT, 2015 WL 3793788, at *12 (Tenn. Ct. App. June 17, 2015) (considering the sufficiency of the removal order although it was not raised

- 13 -

as an issue by either party on appeal).

For instance, in *In re Rylee R.*, No. E2016-00574-COA-R3-PT, 2016 WL 4259064, at *1-3 (Tenn. Ct. App. Aug. 11, 2016), a grandmother had filed a petition for custody of the children at issue, and later, they were removed from her home and adjudicated dependent and neglected. We explained that the ground of persistent conditions was not applicable to terminate the parental rights of the children's mother under those circumstances. "In the first instance," we explained, "the Children were not, in fact, removed from Mother's home; rather, they were removed from [the grandmother's] home." *Id.* at *8. "More importantly, however, it was not the order adjudicating dependency and neglect that precipitated the Children's removal []; rather, it was the petition for custody that was filed by [the grandmother]." *Id.* "Because the Children were not, in fact, removed from Mother's home, nor by an order adjudicating dependency and neglect, we conclude[d] that Appellee failed to meet the threshold requirement for application of the ground of persistent conditions." *Id.* at *9.

The 2018 amendment to this ground changed the phrase "removed from the home of the parent" to "removed from the home *or the physical or legal custody* of a parent." *See* Tenn. Code Ann. § 36-1-113(g)(3) (emphasis added). It also added statutory language expressly requiring removal "by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child." *See id.* The amendment to this ground has been interpreted as "expanding its reach."[6] *In re Savannah M.*, No. M2018-00752-COA-R3-PT, 2019 WL 354869, at *5 n.12 (Tenn. Ct. App. Jan. 28, 2019); *In re Billy C.*, No. M2018-00463-COA-R3-PT, 2018 WL 5751991, at *10 n.6 (Tenn. Ct. App. Nov. 1, 2018). Where the previous version applied only if a juvenile court had adjudicated the child dependent and neglected, the current version "contains a threshold requirement that the ground be predicated upon an order removing the child which was 'entered at any stage of proceedings in which a petition has been filed in the juvenile court *alleging* that a child is a dependent and neglected child.'" *In re Dominic B.*, No. E2020-01102-COA-R3-PT, 2021 WL 774185, at *8 n.11 (Tenn. Ct. App. Mar. 1, 2021) (quoting Tenn. Code Ann. § 36-1-113(g)(3)(A) (emphasis in original)); *see, e.g.*, *In re Braden K.*, No. M2020-00569-COA-R3-PT, 2020 WL 5823344, at *9 n.9 (Tenn. Ct. App. Sept. 30, 2020) (rejecting a parent's argument regarding the finality of the order because the amended version provides that "the order removing a child from a parent's custody can be 'entered at *any stage* of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child'" and "need not be final").

---

[6] As one article noted, "Case law ha[d] interpreted this ground to be available only after the child has been adjudicated to be dependent and neglected, which may be a year or more after the child's actual judicial removal from the home on an initial or preliminary order." Dawn Coppock & Michael S. Jennings, *Tennessee's New Adoption Law*, 54 Tenn. B.J. 16, 18 (July 2018). With the amendment, "[p]ermanency for children will no longer have to wait until all juvenile and appellate proceedings produce a final dependency and neglect finding, a process that can take years, not six months." *Id.*

- 14 -

This Court has stated that under the amended version of the statute, this ground applies "when, by court order, a 'child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months' as a result of a dependency and neglect petition." *In re Boston G.*, No. M2019-00393-COA-R3-PT, 2020 WL 2070399, at *6 (Tenn. Ct. App. Apr. 29, 2020); *see also In re D.V.*, No. E2018-01438-COA-R3-PT, 2019 WL 1058264, at *5 (Tenn. Ct. App. Mar. 6, 2019) ("The child must have been removed from the home or the physical or legal custody of a parent/guardian for a period of six (6) months by a court order entered following a petition alleging that the child is a dependent and neglected child.") For instance, in *In re Noah A.*, No. E2019-01633-COA-R3-PT, 2020 WL 6538461, at *12, *6 (Tenn. Ct. App. Nov. 6, 2020), we found the amended version of the ground was proven regardless of any dispute about a removal from the home because the necessary order removed the child from the parent's *legal* custody. "There was an order that removed Noah 'from the home or the physical or legal custody of' Parents that was entered after Noah was alleged to be dependent and neglected." *Id.* at *6; *see also In re River L.*, No. M2019-02049-COA-R3-PT, 2021 WL 830006, at *13 (Tenn. Ct. App. Mar. 4, 2021) ("the children were removed from Mother's custody by order of the juvenile court based on a petition for dependency and neglect"); *In re Eli H.*, No. E2019-01028-COA-R3-PT, 2020 WL 2300066, at *7 (Tenn. Ct. App. May 8, 2020) ("this ground can apply whenever a child is removed 'from the home or the physical or legal custody of a parent'") (quoting Tenn. Code Ann. § 36-1-113(g)(3)(A)); *In re Ellie K.*, No. M2019-01269-COA-R3-PT, 2020 WL 1943522, at *8 (Tenn. Ct. App. Apr. 23, 2020) (same).

However, in *In re Jude M.*, 619 S.W.3d 224, 229-30 (Tenn. Ct. App. 2020), we reversed this ground for termination where the petitioners "failed to demonstrate the threshold requirement of a petition having been filed in the juvenile court that alleged the Child to be a dependent and neglected child." A juvenile court order removed the child from the mother's physical and legal custody, but it was entered after the father filed a petition for emergency custody, and there was no indication that he alleged dependency and neglect. *Id.* at 242. Under the amended statute, "a threshold requirement for application of this ground is that it be based on an order removing the child that was 'entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child.'" *Id.* at 241 (quoting Tenn. Code Ann. § 36-1-113(g)(3)(A)). Thus, we deemed the statutory ground of persistent conditions "not applicable to this action." *Id.* at 244.

On appeal, Father argues that this ground for termination is not applicable to him because Elijah was removed from his care and custody nearly a month prior to the filing of the dependency and neglect proceeding. Again, the amended language of the termination statute provides the following threshold requirement:

The child has been removed from the home or the physical or legal custody

of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child[.]

Tenn. Code Ann. § 36-1-113(g)(3)(A). We will begin by considering whether Elijah has been "removed from the home" of Father "for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child[.]" *Id.* We conclude that he has not. To briefly recap, Mother and Elijah left the home they shared with Father in February 2018. Father moved in with his parents. Mother filed a petition for an order of protection, and the general sessions court entered a temporary order of protection prohibiting Father from coming about Mother or Elijah. DCS and the parents entered into an immediate protection agreement stating that there would be no visits between Father and Elijah due to the order of protection. In March 2018, DCS filed a petition for dependency and neglect and to transfer temporary legal custody to Aunt and Uncle. At that point, the juvenile court entered a protective custody order granting temporary legal custody of Elijah to Aunt and Uncle. However, Elijah was not "removed from the home" of Father by a court order entered at any stage of a dependency and neglect proceeding because he had been residing in the home of Aunt and Uncle for about a month when the petition was filed. *See, e.g.*, *In re Billy C.*, 2018 WL 5751991, at *10-11 (reversing this ground where the child had already been living with the petitioners for five to six weeks when they filed the dependency and neglect petition, and therefore, the child was not "removed from Father's home by an order of the court"); *In re Veronica T.*, No. M2017-00726-COA-R3-PT, 2018 WL 1410909, at *3-4 (Tenn. Ct. App. Mar. 21, 2018) (reversing this ground where the children were removed from the mother's "home" and placed with relatives when she voluntarily signed an immediate protection agreement, and after three relative placements, a dependency and neglect action was filed); *In re Kandace D.*, 2018 WL 324452, at *7 ("[T]he Child had already been removed from Father's home by [a neighbor] with the biological parents' consent at least one month before DCS became involved. Accordingly, we reverse the trial court as to the ground[] of persistence of conditions."); *In re Miracle M.*, No. W2017-00068-COA-R3-PT, 2017 WL 3836020, at *7-8 (Tenn. Ct. App. Aug. 30, 2017) ("[T]he statutory ground of persistence of conditions is not applicable to Father under the facts presented here insomuch as the record contains no evidence to suggest that the Children were residing in Father's home at the time of their removal."); *In Re Jayden B.T.*, No. E2014-00715-COA-R3-PT, 2015 WL 3876573, at *10 (Tenn. Ct. App. June 23, 2015) ("[W]hen the trial court entered the emergency protective order placing the Child in the temporary custody of the Petitioners, the Child had not been residing in Father's home. Accordingly, we reverse the trial court's finding as to persistence of conditions[.]").

Because of the amendment to the statute, we must also consider whether Elijah "has been removed from the . . . physical or legal custody" of Father "for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child[.]" *See*

- 16 -

Tenn. Code Ann. § 36-1-113(g)(3)(A).  Again, we conclude that he has not.  Just as Elijah was not in Father's home, he was not in his physical custody either due to Mother's physical removal of the child, the order of protection, and the immediate protection agreement.

We also conclude that Elijah was not in Father's legal custody.  Elijah was born to unmarried parents.  As we explained in *In re Audrey S.*, regarding an unwed mother, "[Mother] was never married to Terry S. or Justin L., and she therefore had legal custody of both children when they were born."  182 S.W.3d at 872 (citing Tenn. Code Ann. § 36-2-303 (2001); *Baskette v. Streight*, 106 Tenn. 549, 556, 62 S.W. 142, 144 (1901); James G. Dwyer, *A Taxonomy of Children's Existing Rights in State Decision Making About Their Relationships*, 11 WM. & MARY BILL RTS. J. 845, 859 & n.28 (2003)).  Tennessee Code Annotated section 36-2-303 provides, "Absent an order of custody to the contrary, custody of a child born out of wedlock is with the mother."  Here, the record does not contain any custody order "to the contrary."  *See id.*  Prior to the dependency and neglect proceeding, it appears that the only order to address custody was from the general sessions court that heard Mother's petition for an order of protection, and its order provided, "Mother shall have temporary custody of the minor child(ren) in this case until this matter is heard."[7]  As such, Elijah was never placed in, or removed from, the "legal custody" of Father.  *Cf. In re Heaven J.*, No. W2016-00782-COA-R3-PT, 2016 WL 7421381, at *12 (Tenn. Ct. App. Dec. 22, 2016) (concluding that an order did not remove the child from the father's custody as "he never had custody of her"); *In re Maria B.S.*, No. E2012-01295-COA-R3-PT, 2013 WL 1304616, at *11 (Tenn. Ct. App. March 4, 2013) ("No one removed the Children from Father—he never had the Children in the first place.").[8]

For these reasons, we conclude that the ground of persistent conditions is inapplicable to Father and reverse the trial court's finding as to this ground for termination.

### 2.  Failure to Manifest

The second and final ground for termination that we must address is a relatively new addition to the termination statute.  Tennessee Code Annotated section 36-1-113(g)(14)

---

[7] Tennessee Code Annotated section 36-3-606(a)(6) provides that "[a] protection order granted under this part to protect the petitioner from domestic abuse, stalking or sexual assault may" include provisions "[a]warding temporary custody of, or establishing temporary visitation rights with regard to, any minor children born to or adopted by the parties[.]"

[8] The fact that Father's name was on the birth certificate does not alter our conclusion.  The names listed on a birth certificate "are not a finding of parentage nor do they create or terminate parental rights." *In re Adoption of A.F.C.*, 491 S.W.3d 316, 319 (Tenn. Ct. App. 2014).  A biological father's execution of a voluntary acknowledgment of paternity pursuant to Tennessee Code Annotated section 24-7-113 constitutes a "'legal finding of paternity.'" *In re Taya K.*, No. M2017-00846-COA-R3-PT, 2018 WL 723761, at *6 (Tenn. Ct. App. Feb. 6, 2018) (quoting *In re Adoption of A.F.C.*, 491 S.W.3d at 319 n.2).  Even then, however, "a VAP does not vest any custody rights or visitation rights upon the legal father." *Baxter*, 620 S.W.3d at 894.

applies when:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Two prongs must be proven by clear and convincing evidence: "(1) the parent [] failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child; and (2) placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020).

> According to our supreme court,

> [S]ection 36-1-113(g)(14) places a conjunctive obligation on a parent [] to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child. If a person seeking to terminate parental rights proves by clear and convincing proof that a parent [] has failed to manifest either ability or willingness, then the first prong of the statute is satisfied.

*Id.* at 677. We also note that the statute, by its terms, applies where the parent has failed to manifest "an ability and willingness to personally assume *legal and physical custody or financial responsibility* of the child." Tenn. Code Ann. § 36-1-113(g)(14) (emphasis added); *see, e.g.*, *In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *12 (Tenn. Ct. App. July 22, 2020) *perm. app. denied* (Tenn. Dec. 10, 2020) ("While Father's actions have indicated that he indeed has manifested a willingness to assume custody of the child, there can be little dispute that Father has not manifested a willingness to assume financial responsibility for Braelyn.").

Here, the trial court made the following findings regarding the first prong of this ground:

> The evidence was persuasive that Father exercises the limited parenting time afforded to him. During his limited time with Child, Father is engaged and attentive to Child. Father had physical custody of Child until he was removed for reasons that primarily related to Mother's problems. Because Mother obtained an ex parte order of protection that extended to the Child, Father was initially unable to have custody of Child. He *remains willing to have custody* of Child, but Father does not support himself, let alone the Child, because his housing and finances are now provided for by

- 18 -

them. He has not worked for the purposes of providing for his son, because he has never voluntarily paid child support. He had the ability to provide for his son; he has the present capacity to provide for his son, but he has *willingly refused to support his son*, as evidence[d] by the lack of financial support provided for Child.

There was no direct evidence that Father was ever under the influence of alcohol or drugs in the presence of the Child. He had a home for the child and Mother prior to her filing the order of protection. He now lives with his parents but maintains an appropriate bedroom for the Child. There was no persuasive evidence that he was engaged or continues to be engaged in domestic violence.

But Father is not actively seeking to remedy his drug usage or to *financially support* himself or Child. Father is content to allow others to raise his child, to allow others to support his child – so long as [he] retains the title of father, ha[s] periodic visits with Child, and continue[s] to live his life without the burdens of responsibility. His contentment includes the periodic and continuous use of illegal substances.

(emphasis added). From these findings, it appears the trial court concluded that Father failed to manifest a "willingness to personally assume . . . financial responsibility of the child." Tenn. Code Ann. § 36-1-113(g)(14). Clear and convincing evidence supports this conclusion. From the time Elijah was placed with Aunt and Uncle in February 2018 until the time of trial in June 2020, Father sent no monetary support to Aunt and Uncle. Although he was under an order to pay child support, he did not send anything voluntarily. Aunt and Uncle received money on three occasions, but those payments were from tax and stimulus intercepts. As such, they do not demonstrate a *willingness* by Father to assume financial responsibility.

Although Father mentioned that he gave Elijah some clothing, shoes, and a bicycle for a birthday gift "last year or this year," he never specifically stated that he purchased these items with his own earnings, and Father kept those items at his parents' home. On appeal, Father similarly points to the fact that Elijah had a bedroom with "furnishings" and that food was provided for Elijah at the home during visits, but he does not point to any evidence in the record to show that these were purchased by Father as opposed to the paternal grandparents. As such, they do not demonstrate *Father's* willingness to *personally assume financial responsibility* for the child. In fact, Father made it a point to emphasize at trial that he did not own any possessions that Aunt and Uncle could "take" for child support. Regarding his limited ownership of property, Father testified:

Q.   Do you own anything other than your clothes . . .
A.   No.
Q.   . . . and some personal possessions?
A.   That's everything that they can't take.

- 19 -

THE COURT: Who's they?

A.     [Aunt and Uncle]. I got a piece of paper saying that they were entitled to, you know, . . . to seize up to $10,000.00 worth of everything but my britches and my Bible. So, no I don't have any vehicles or any homes or . . .

Q.     So that . . .

A.     . . . a bank account or none of that.

Q.     You're, you're admitting that that's intentional so they can't get access to any of it?

A.     I'm admitting that I don't have a bank account. I don't have a vehicle or a home or nothing that belongs to me.

While Father was unwilling to send *any* financial support to Aunt and Uncle for Elijah, he was admittedly buying Subutex and Xanax illegally from an individual in another town. The following exchange occurred at trial regarding these purchases:

Q.     Where'd you get the money to do that? You were owing $800.00 a month in child support.

A.     Mowing the neighbor's yard.

Q.     You saved money – so you mowed lawns so you can buy drugs but not so you could take care of your kid?

A.     That was awful, wasn't it?

Q.     Yeah.

A.     I admit that's wrong.

Father also continued to use marijuana regularly, smoke cigarettes daily, and purchase alcohol, while sending zero dollars over the course of two years for the support of Elijah. The evidence clearly and convincingly shows that Father failed to manifest a "willingness to personally assume . . . financial responsibility of the child." Tenn. Code Ann. § 36-1-113(g)(14).

The second prong of this ground for termination requires a showing, by clear and convincing evidence, that "placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]" *Id.*

The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a

- 20 -

reasonable person to believe that the harm will occur more likely than not.

*In re Malachi M.*, No. E2020-01114-COA-R3-PT, 2021 WL 1140272, at *6 (Tenn. Ct. App. Mar. 25, 2021) (quoting *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018)).

The trial court made the following findings specific to this prong:

> The evidence was clear and convincing that Father having legal and physical custody of Child would pose a risk of substantial harm to the physical or psychological welfare of the Child. He has demonstrated a consistent usage of illegal drugs, which may be a part of the reason that his lack of interest in sustained parenting, lack of independence from his parents, and disinterest in paying child support persists.
> Although Father's limited focus on parenting responsibilities may be mitigated by his living with his parents, in the sense that general supervision of his parenting occurs, the Child is not safe to be alone with him for extended periods, due to Father's drug usage.

Sadly, we agree with this conclusion. Father has not resided in a home with Elijah since February 2018. Since that time, Father has had numerous opportunities to demonstrate that he can offer a safe and drug-free environment for Elijah. As the trial court noted, the main obstacle preventing Elijah's return was Father's inability to demonstrate that he was drug-free, yet Father chose not to address that obstacle. Over the years, he agreed to take hair follicle and nail bed drug screens but never followed through with his obligations. Admittedly, Father did not complete the most recent screen because he was "sure to have failed it." Even after losing his son and knowing that he was being asked repeatedly to take drug screens, Father continued to use drugs. Again, his own testimony is enlightening:

> Q. And you sat here and told this court I will, you know, I was going to do whatever DCS asked me to do to get my custody back and you just kept using drugs the whole time[?]
> A. Evident[ly].
> Q. So you're saying you've been clean two months. So the first 26 months of the proceedings, you admit you were not clean?
> A. Yes, sir. There would've been marijuana or Subutex in my system and maybe a Xanax.

Although Father claimed at trial that he had been "clean" from marijuana and Subutex for "[p]robably two months," he had not proven this by taking a drug screen. Also, we do not know whether Father's testimony about the extent of his drug use for the past 26 months was true. He admitted that his prior testimony from October about only having marijuana in his system was a lie. Moreover, Father lied to the court more than once on the day of

- 21 -

trial about having Mother in the home after she incurred meth charges. As such, there is reason to doubt Father's uncorroborated testimony that he was actually drug-free on the date of trial.

After 28 months of opportunities to prove himself, by the time of trial, Father was still only limited to supervised visitation with his son. He had no driver's license, no vehicle, no savings, no stable employment, and no home of his own. During the termination proceeding, when Father should have been the most motivated to change his behavior, he became so intoxicated that he did not remember "much of that day," leading to the incident for which he pled guilty to assault on a police officer, vandalism, and public intoxication. Meanwhile, Elijah had been integrated in a stable home with Aunt and Uncle for over two years. Considering all of these circumstances, the evidence is clear and convincing that placing Elijah in Father's legal and physical custody "would pose a risk of substantial harm to the physical or psychological welfare of the child[.]" Tenn. Code Ann. § 36-1-113(g)(14); *see In re Anari E.*, No. M2020-01051-COA-R3-PT, 2021 WL 1828500, at *17 (Tenn. Ct. App. May 7, 2021) ("Given Father's unabashed drug use, as well as his continual failure to achieve stability, an unacceptable risk of harm would inhere were the Children returned to Father's care."); *In re Greyson D.*, No. E2020-00988-COA-R3-PT, 2021 WL 1292412, at *9 (Tenn. Ct. App. Apr. 7, 2021) (finding a risk of substantial harm where a mother had unaddressed issues regarding housing and employment and "was still using illegal drugs even in the days before the trial that was to determine if her parental rights should be severed"); *In re Brayden E.*, No. M2020-00622-COA-R3-PT, 2020 WL 7091382, at *5 (Tenn. Ct. App. Dec. 4, 2020) ("Naturally, placing the Children with a parent who has not shown the ability and willingness to abide by the law would put them at substantial risk for harm.").

### B. Best Interest

If at least one ground for termination has been proven by sufficient evidence, "the court next determines whether the proof amounts to clear and convincing evidence that terminating parental rights is [in] the best interests of the child." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017) (citing *In re Carrington H.*, 483 S.W.3d at 523). When the petition was filed in this case, Tennessee Code Annotated section 36-1-113(i) listed nine statutory factors for consideration.[9] Determining what is in the best interest of a child "involves more than simply 'tallying the number of statutory factors weighing in favor of or against termination.'" *In re Neveah M.*, 614 S.W.3d at 679 (citing *In re Gabriella D.*, 531 S.W.3d at 682). The analysis is factually intensive, and "[t]he unique facts and

---

[9] "The Tennessee General Assembly recently amended the statutory best interest factors provided in Tennessee Code Annotated section 36-1-113(i)." *In re Porcalyn N.*, No. E2020-01501-COA-R3-PT, 2021 WL 2026700, at *12 n.6 (Tenn. Ct. App. May 21, 2021) (citing 2021 Tenn. Pub. Acts, ch. 190 § 1). However, "[t]his amendment does not affect the instant case because we apply the version of the statute in effect at the time the petition for termination was filed." *Id.* (citing *In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017)).

circumstances of each case dictate the weight and relevance that a court should afford each statutory factor." *Id.* "A court must consider all the statutory factors but may appropriately ascribe more weight—even outcome determinative weight—to one statutory factor or rely upon fewer than all of the statutory factors." *Id.*

We must bear in mind that the child's best interest is viewed from the child's perspective rather than the parent's perspective. *In re Gabriella D.*, 531 S.W.3d at 681. "'[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child.'" *Id.* at 681-82 (quoting Tenn. Code Ann. § 36-1-101(d)).

The first statutory factor is whether the parent "has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent[.]" Tenn. Code Ann. § 36-1-113(i)(1). The trial court found that this factor weighed in favor of terminating Father's parental rights. It found that Father's present circumstance of living with his parents "is stable on a basic level." However, the court was not persuaded that Father's home was safe and appropriate for a child because Father and Grandfather "either consume or tolerate drug usage." The trial court found that Father "refuses to have a drug screen in either the Juvenile or Chancery courts." Given his past drug use, the trial court found that Father "has failed to establish that his usage has ceased." The trial court also noted that Elijah's behavior regresses after visits with Father. Further, the court noted that Father does not support the child and has not attempted to establish his own housing to support himself and his son. We agree that this factor weighs in favor of termination. After 28 months, Father had not adjusted his circumstances to make it safe and in the best interest of Elijah to return to his home.

The second factor is whether the parent "has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible." Tenn. Code Ann. § 36-1-113(i)(2). The trial court found that this factor did not favor terminating Father's parental rights because "DCS essentially provided no services to Father." The trial court noted that Father was required to pay for a paternity test and faced barriers and delays at the outset when attempting to gain custody of Elijah. We agree that this factor does not weigh in favor of termination.

The third factor is whether the parent "has maintained regular visitation or other contact with the child." Tenn. Code Ann. § 36-1-113(i)(3). The trial court found that this factor did not weigh in favor of termination because Father has maintained regular visitation with Elijah. Again, we agree.

The fourth factor is "[w]hether a meaningful relationship has otherwise been established between the parent [] and the child[.]" Tenn. Code Ann. § 36-1-113(i)(4). The trial court found that Father and Elijah "are bonded" and that Elijah enjoys his time with

- 23 -

Father.  It found that Father devotes his time and attention to Elijah during visits and ensured that Christmas and Elijah's birthday were celebrated during the limited time they had together.  The court found that "a meaningful relationship" does exist between them, and therefore, this factor does not support termination of the parent-child relationship.  Once again, we agree.

The next factor to consider is "[t]he effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition."  Tenn. Code Ann. § 36-1-113(i)(5).  The trial court found that Elijah has a close relationship with Aunt and Uncle and looks to them as his nuclear family.  Because of that strong bond, the court found that it would be disruptive for the child to change from their care to Father's care.  "Although Father is appropriate at his limited parenting time visits," the trial court observed, "the evidence was not persuasive that Father would maintain a safe physical environment for the child with full parenting time with Child, as he continues to use drugs."  The trial court found that Father was not established or responsible.  It also noted that a long time period had passed since Elijah regularly lived with Father and that it would take a toll on Elijah, emotionally and developmentally, if his living situation with Aunt and Uncle was disrupted.  The trial court found that Elijah was "not thriving" when he lived in the home of Father and Mother.  It also found that "[n]othing of significance has changed to warrant confidence that Father will do better."  Thus, the trial court found that this factor favored terminating parental rights.  The evidence supports the trial court's conclusions.  Elijah acted in an aggressive and defiant manner after visits with Father, even cursing at times, although he was only three years old.  By the time of trial, Elijah had been residing with Aunt and Uncle for far longer than he had ever resided with Father.  Due to Father's failure to demonstrate any semblance of responsibility during that time period, a change of caretakers would likely have a detrimental effect on Elijah.

The sixth factor is "[w]hether the parent [], or other person residing with the parent [], has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household."  Tenn. Code Ann. § 36-1-113(i)(6).  The trial court found that this factor did not weigh in favor of termination because Father had not engaged in any abusive conduct toward Elijah or any other individual in his family or household.  The trial court found that the evidence did not show that Father was abusive toward Mother prior to Father's loss of parenting time.  It noted that Mother did not testify to contradict Father's assertion that the reason she failed to pursue her petition for an order of protection was because her claims were untrue.  We agree with the trial court's assessment of this factor.

Factor number seven is "[w]hether the physical environment of the parent's [] home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent [] consistently unable to care for the child in a safe and stable manner."  Tenn. Code Ann. § 36-1-113(i)(7).  Regarding this factor, the trial court found that the "physical

- 24 -

environment" of Father's home, and his mutually agreeable living arrangement with his parents, is healthy and safe in the sense that Elijah would not be physically abused. However, "one important concern" remained, for the trial court. Father and Grandfather use marijuana, and Father also uses Xanax and Subutex. The trial court acknowledged that Father "is not a debilitated and non-functional chronic drug user," in contrast to Mother. The trial court also found that Father is not engaging in any criminal activity "except when he violates the law to use addictive substances." It found that Father's only "brush with the law" came after he drank too much at his girlfriend's house, and there was no proof that he drank excessively when Elijah was present. Still, the trial court specifically pointed out that this factor requires consideration of whether the parent's substance use may render him or her "unable to care for the child in a safe and stable manner." *See id.* Thus, the trial court found that any positive considerations in relation to this factor were "outweighed by other signs of persistent drug usage," including Father's lack of ambition, his dependency on relatives to support him, and the bad behavior exhibited by the child when he returned from visits with Father. Because Father refused drug screens, the trial court concluded that it was "denied important evidence that would allay any concern about Father's drug usage." The trial court ultimately concluded that Father's lack of drive rendered him "unable to care for himself, let alone his Child." We agree that this factor weighs in favor of termination of parental rights. As the trial court aptly noted earlier in its order, "[t]here is little expectation that Father will turn away from his substance abuse, as the pendency of this case failed to sharpen his resolve to end this behavior that precluded his child from being returned to him by the Juvenile Court."

The eighth factor for consideration is whether the parent's "mental and/or emotional status would be detrimental to the child or prevent the parent [] from effectively providing safe and stable care and supervision for the child." Tenn. Code Ann. § 36-1-113(i)(8). The trial court found that this factor did not weigh in favor of terminating parental rights because there was no evidence that any mental or emotional defect was precluding Father from effectively providing safe and stable care for Elijah. "Rather," the court added, "it is his drug usage that makes him an unfit parent." We agree that this factor does not weigh in favor of termination.

Factor nine is "[w]hether the parent [] has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101." Tenn. Code Ann. § 36-1-113(i)(9). The trial court found that this factor weighed in favor of termination. It found that Father was ordered to pay $793 per month in child support and yet had made no voluntary child support payments. The only money received was intercepted from tax refunds or stimulus payments from the federal government. The trial court was not persuaded that Father was unable to pay some child support, noting that he had worked at times during past the two years. We agree with this assessment.

Considering all these factors, the trial court acknowledged that some weighed in favor of termination and others did not. The court rightly noted that it must consider the

factors that are most relevant for Elijah. While recognizing that Father had never mistreated the child and that he had maintained "a rudimentary father-child relationship," the trial court also found that Elijah was developmentally delayed when he came into the custody of Aunt and Uncle after living in Father's household.[10] The trial court found that Father's household had been ridden with chronic drug usage, mostly by Mother, but that Father had continued to engage in drug usage since that time. The trial court found that Father "has lied to the Court" about his drug use. It also found that Father had taken no affirmative steps to financially support Elijah or to acquire his own housing to provide a home for Elijah. Even though Elijah's development had been hindered in Father's household, the court found that he had thrived in the care of Aunt and Uncle. The court noted Elijah's undesirable behaviors upon returning from visits with Father and concluded that Elijah would not thrive if the parent-child relationship was maintained. Thus, the court found by clear and convincing evidence that termination was in the best interest of Elijah.

Regrettably, we must agree with the trial court. When Elijah was adjudicated dependent and neglected in October 2018, the juvenile court noted that Father had "a lot of work to do" and was displaying "an attitude that he seems to know better than the professionals." However, the court added, "there is still hope that [the parents] can regain custody if they apply themselves to this process." The juvenile court directed the parents to complete parenting classes, pay child support, and complete hair follicle drug screens. Father did none of these things. Thus, his actions raise doubts about his actual willingness to assume custody of Elijah. Even after a petition to terminate his parental rights was filed in June 2019, Father did not put forth the effort to adjust his circumstances and demonstrate that he could safely parent Elijah. In fact, he showed the opposite. In September 2019, just months after the petition was filed, he was taken to jail after assaulting a police officer and vandalizing a police car when he was so drunk at around 4:30 p.m. that he does not remember much of the day. Even that incident was not enough to change his habits. He admittedly continued to use marijuana, Subutex, and Xanax thereafter, until right before trial in June 2020, knowing that doing so could jeopardize his relationship with Elijah. We do not know whether Father actually stopped using drugs or used any other drugs because he refused to take a drug test and has shown that he will lie about his drug use.[11] By the time of trial, 28 months after Elijah left his home, Father had no proof that he was drug free, no driver's license, no vehicle, no stable employment, no savings, and no home of his own. Considering the best interest of Elijah, from the perspective of the child, we find clear and convincing evidence that termination of parental rights is in his best interest.

---

[10] Father argues on appeal that the evidence does not support the trial court's finding that Elijah was "severely developmentally delayed." We agree because the trial court sustained a hearsay objection to Aunt's testimony about the results of the testing on Elijah. Still, Aunt testified without objection that Elijah was "struggling" and "wasn't speaking at all" but "was grunting and that was about it." Considering the entire record, we discern no reversible error with regard to this issue.

[11] When Father was asked at trial about his false testimony from October that he would only test positive for marijuana, he said, "I'm scared that they'll take my son from me forever. That's why I lied. Yeah. Wouldn't you?"

## V.  CONCLUSION

For the aforementioned reasons, the decision of the chancery court is reversed in part, affirmed in part, and remanded.  We affirm the termination of Father's parental rights. Costs of this appeal are taxed to appellant, Brian R., for which execution may issue if necessary.

_____

CARMA DENNIS McGEE, JUDGE